UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD CAHILL,<br><br>             Plaintiff,<br><br>v.<br><br>GOLDEN GATE BRIDGE, HIGHWAY<br>AND TRANSPORTATION DISTRICT,<br><br>             Defendant. | Case No.  15-cv-01374-JCS<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 33 |

## I.     INTRODUCTION

This admiralty case arises from an incident in which Plaintiff Richard Cahill, a deckhand, fell from the deck of the ferry *Golden Gate*, which was owned and operated by Defendant Golden Gate Bridge, Highway, & Transportation District (the "District").  Cahill brings claims for unseaworthiness and Jones Act negligence, and the District moves for summary judgment on both claims.  The Court held a hearing on March 11, 2016.  For the reasons discussed below, although the evidentiary record is somewhat thin, the Court holds that a rational jury could find in Cahill's favor.  The District's Motion is therefore DENIED.[1]

## II.     BACKGROUND

### A.     Factual Background

Plaintiff Richard Cahill first worked as a deckhand for on the District's ferries in the 1970s.  Cahill Dep. 15:24−16:3.[2]  At the time of the accident in 2014, Cahill had worked full time as a deckhand for the District for about twelve years, and had served on all of the District's ferries and routes.  *Id.* 17:8−24.  He was familiar with the *Golden Gate* and comfortable working on it,

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

[2] Excerpts of Cahill's deposition appear in the record as Exhibit A to the declaration of David Russo (dkt. 33-1) and Exhibit 2 to the declaration of Lia Marks (dkt. 37).

including working from the stern deckhand position. *Id.* 20:14−18, 21:21−22:2.

The afternoon of June 17, 2014, Cahill was involved in an accident on the *Golden Gate*. *Id.* 18:4−9, 20:21−22; Russo Decl. Ex. D (security video of the accident). Cahill was working the stern position as the ferry approached the dock of the Larkspur terminal. Cahill Dep. 21:18−20, 22:21−25. Cahill's role required him to use a long hook to catch a hanging dock line and pull it toward the ferry, and then to place an eye at the end of the line around a cleat in an open chock— an opening in the guardrail—near the stern of the ferry. *Id.* 23:23−26:4. He had performed the same docking evolution[3] at Larkspur in the past, *id.* 21:21−22:2, and he testified at his deposition that on June 17, 2014 he performed the evolution the same way he normally did, *id.* 33:6−9, 34:18−22. The manner in which the ferry docked that day was different, however, in that the water was "kind of rough" where it would usually be calm and the captain brought the ferry in bow-first, rather than parallel to the dock. *Id.* 36:2−8. Another deckhand attached a dock line at the bow so that the stern of the ferry "could swing back in." *Id.* 37:12−15. Cahill could tell what maneuver the captain was executing, but he did not think about whether the ferry would hit the dock harder than usual and did not do anything different to prepare for the docking evolution. *Id.* 37:19−38:8, 38:12−17. The stern "came back in pretty good and bumped the dock"—according to Cahill, "[a] lot harder" than usual. *Id.* 35:15−21, 37:15−16. Cahill, focusing on the dock line and walking backwards to try to catch it, fell overboard through the open chock when the stern bumped the dock. *Id.* 36:10−12, 46:22−25.

Video of the accident taken by a security camera on the *Golden Gate* shows Cahill standing forward of the open chock as the ferry approaches the dock at a not-quite-parallel angle. Russo Decl. Ex. D. Cahill extends a boat hook toward the hanging dock line. *Id.* As the ferry comes to a stop, Cahill takes a few steps towards the stern of the vessel to align himself with the hanging dock line, which results in him standing at the open chock. *Id.* When the ferry stops moving forward, the stern appears to be too far from the dock for Cahill to reach the dock line with his hook. *Id.* The stern then swings toward the dock. *Id.* Cahill falls overboard through the

---

[3] In the jargon of the industry, the term "evolution" refers to a procedure or maneuver—e.g., docking and tying up the *Golden Gate* to the Larkspur dock.

1    open chock and disappears from view as the ferry appears to rebound from the dock.  *Id.*

2            Defendants also submit a video, taken by defense counsel, of another deckhand on the

3    *Golden Gate* performing the same evolution at a later date.  Russo Decl. ¶¶ 3−4 & Ex. B.  This

4    video is shot from a different angle than the security footage, so it is difficult to compare the two

5    precisely, but it appears to show the ferry approaching the Larkspur dock more slowly and at a

6    more parallel angle than on the day of the accident.  *See id.* Ex. B.  Like Cahill, the deckhand

7    begins from a position slightly forward of the open chock, but then walks forward rather than aft

8    to grab the dock line with his hook.  *Id.*  He only walks aft to the chock after he has the dock line

9    in his hand, and he then loops it over the cleat in the chock.  *Id.*  There is no indication of the ferry

10   swinging toward or rebounding from the dock.  *Id.*  Cahill agreed at his deposition that this video

11   shows how the stern deckhand's docking evolution should normally be performed.  Cahill Dep.

12   48:4−13.

13           When asked at his deposition whether various factors were at fault, Cahill testified as

14   follows:

15           Q. Do you believe -- and I am just asking your belief -- do you
             believe that the captain was at fault for your accident?

16           A. No.

17           Q. Do you believe that the actions of any other deckhand were at
             fault for your accident?

18

19           A. No.

20           Q. Do you believe that something about the ferry itself was at fault
             for your accident?

21           A. No.

22           [. . .]

23           Q. Is it your belief that what is at fault for the accident is the rougher
             water which caused the ferry to have to come in at more of an angle?

24

25           [. . .]

26           THE WITNESS: Yes.

27   *Id.* 51:9−52:2.[4]  Cahill later clarified that he believed the width of the open chock—which was

28           _____

             [4] Cahill's attorney objected to this line of questioning as calling for expert opinions from a

United States District Court
Northern District of California

wider than on other ferries operated by the District—contributed to the accident, and that he would not have fallen overboard if it had been narrower. *Id.* 59:8−15, 60:12−21. He apparently did not understand defense counsel's question regarding whether "something about the ferry itself" was at fault to encompass the width of the chock. *Id.* 60:12−24. A rope or chain that can be fastened across the open chock was not in place at the time of the accident, but Cahill does not believe that it would have prevented him from falling overboard even if it had been. *Id.* 40:5−17.

A "Ferry Division Report of Accident or Illness" prepared by Captain Richard Fiero on the day of the accident indicates that Cahill received treatment from paramedics and was transported from the ferry terminal in an ambulance. Marks Decl. Ex. 1. Fiero's report includes the following description of the incident: "Hit back of head, bruised ribs. While grabbing stern line boat bumped float causing Mr. Cahill to lose his balance and fall through chock onto lower float." *Id.*

The open chock on the *Golden Gate* has not changed in the time that Cahill was familiar with the vessel. *Id.* 52:17−23. Before the accident, Cahill never fell through the open chock, never came close to falling through the open chock, and never complained to anyone about the open chock. *Id.* He never suggested that the District make the chock on the *Golden Gate* narrower, nor had he heard anyone else make that suggestion. *Id.* 62:23−63:5. Captain Robert Ketchum, the supervising vessel master for the District's Ferry Division at the time of the accident and a seventeen year veteran of the District, stated in his declaration that he has "never heard of any deckhand falling through an open chock onboard the M/V GOLDEN GATE or other ferries with the same configuration," or "of any deckhand voicing concern regarding the open chock configuration or the docking evolution that Mr. Cahill was performing," including in monthly deckhand safety meetings. Ketchum Decl. ¶¶ 6−7.

**B.    Captain Sweeney's Report**

Cahill submits a report by expert witness Captain Katharine A. Sweeney, an experienced mariner, maritime safety auditor, and incident investigator. Marks Decl. ¶ 4 & Ex. 3; *see also id.* ¶ 6 & Ex. 5 (CV).

layperson. Cahill Dep. 51:19−20.

United States District Court
Northern District of California

United States District Court
Northern District of California

According to Sweeney, the ferry captain's "actions . . . in docking the vessel caused the Mr. Cahill's [sic] injury," based on "[t]he vessel's fast approach coupled with the too great of an angle/distance away from the dock." *Id.* Ex. 3 at 1. Based on a comparison of the security video with the District's video of the normal docking evolution, Sweeney concludes that the ferry approached the dock two to three times faster in the security footage. *Id.* She also notes that the ferry's approach on the day of the accident required Cahill to move out of position in a way that the deckhand in the other video did not. *Id.*

Next, Sweeney states that the *Golden Gate* was not in compliance with Coast Guard regulations regarding guard rails or bulwarks, specifically 46 C.F.R. § 177.900. *Id.* She also states that the custom in the industry calls for using three chains across the top, middle, and bottom of any openings in bulwarks, whereas the *Golden Gate* had only one chain or rope that could be fastened across the open chock. *Id.* at 1−2.

Third, Sweeney concludes that the District's training policies for deckhands are inadequate because, while the District requires new deckhands to receive "hands-on" training from senior deckhands, it does not specify the content of such training. *Id.* at 2.

Fourth, Sweeney states that the District failed to follow a manual for safe line handling issued by the Passenger Vessel Association ("PVA"), an industry group of which the District is a member. *Id.* According to Sweeney, the PVA's manual notes that line handling can be among the most dangerous jobs on a vessel if done incorrectly, and calls for dock lines to be passed to the deckhand by a crew member stationed on the dock. *Id.* Sweeney concludes that the District's practice of deckhands catching lines from the vessel is more dangerous than the recommended practice. *Id.*

Finally, Sweeney notes that the District "did not have any system in place to empower its workers to ask questions or to speak up if they thought something was unsafe," and concludes that "[h]ad a stop work policy been in place . . . Mr. Cahill would have been empowered and could have spoke up and told the captain it was unsafe to get the line." *Id.* at 3.

**C.    Garrison Incident**

Plaintiff's counsel Lia Marks's declaration includes a paragraph stating that another

1  deckhand, James Garrison, previously fell overboard from the stern of a similar ferry while

2  docking at Larkspur.  Marks Decl. ¶ 7.  Marks's knowledge of that incident is based on her

3  representation of Garrison in a lawsuit against the District.  *Id.*  There is no indication that Marks

4  had firsthand knowledge of Garrison's accident.  *See id.*  The Court therefore disregards that

5  paragraph as hearsay.[5]

6      **D.**    **Procedural History and Parties' Arguments**

7        Cahill brought this action on March 25, 2015.  The parties are currently engaged in

8  discovery, with fact discovery to close on April 5, 2016 and expert discovery to close on May 6,

9  2016.  Order Continuing Discovery Dates (dkt. 41).  Trial is scheduled for June of this year.  Case

10  Mgmt. Scheduling Order (dkt. 25).

11        The District filed its present Motion for Summary Judgment on January 15, 2016.  *See*

12  *generally* Mot. (dkt. 33).  Apparently based on Cahill's deposition testimony that he did not

13  believe the ferry captain was responsible for his injury, the District's Motion addresses negligence

14  only based on the conditions of the vessel, and does not address negligent operation.  *See id.* at

15  2−8.  The District contends that Cahill cannot recover for negligence because the District had no

16  notice of any unsafe condition.  *Id.* at 7.  The District also argues that Cahill cannot recover based

17  on negligence or unseaworthiness because his injury was caused solely by his own negligence.  *Id.*

18  at 8, 10−11.

19        Cahill responds in his Opposition that violations of two Coast Guard regulations establish

20  both negligence and unseaworthiness *per se*: 33 C.F.R. § 83.06, which requires that vessels be

21  operated at safe speeds such that they can avoid collision, and 46 C.F.R. § 42.15-75(d), which

22  requires guardrails in certain circumstances on certain vessels.  Opp'n (dkt. 36) at 4−5, 10−12.

23  According to Cahill, these *per se* violations eliminate any need to show that the District had notice

24  of unsafe conditions, bar any defense of contributory or comparative negligence, and require the

25

26       [5] Defense counsel David Russo, whose firm represented the District in Garrison's lawsuit,
disputes Marks's account of that incident.  Reply at 9 & n.4.  But Russo does not even offer a

27  declaration on the subject, instead simply asserting in Cahill's reply brief that Marks is incorrect,
without citation to evidence.  *Id.*  Arguments contained in legal briefs are not evidence, but

28  because there is no admissible evidence to support Marks's contention in the first place, the
District's failure to present evidence in response is irrelevant.

United States District Court
Northern District of California

1    Court to assume that the violations caused Cahill's injury.  *Id.* at 5−6, 7−8, 9−10.  Cahill also

2    argues that the District had notice of risk based on the incident of Garrison falling overboard.  *Id.*

3    at 7.

4          In its Reply, the District argues that Captain Sweeney's report is inadmissible because it is

5    not a sworn declaration and not supported by specific facts.  Reply (dkt. 38) at 2−3, 5.  The

6    District contends that Cahill's *per se* theories should be barred because he did not explicitly plead

7    them in the Complaint.  *Id.* at 3−4.  It also argues that the *per se* theories of liability fail on the

8    merits for a number of reasons, including but not limited to: (1) regulations calling for an exercise

9    of judgment cannot form a basis for *per se* liability; (2) the regulations were not intended to

10   prevent the type of harm that occurred; (3) the guardrail regulation cited in Cahill's Opposition

11   does not apply to vessels that voyage exclusively in United States waters; (4) another guardrail

12   regulation cited in Sweeney's report does not apply to vessels that carry more than 150

13   passengers; (5) the PVA line handling manual cited in Sweeney's report is not a regulation and

14   does not say what Sweeney says it does;[6] and (6) the facts of the case and the regulations Cahill

15   relies on do not give rise to a presumption of causation.  *Id.* at 5−9.  The District disputes Cahill's

16   characterization of the prior Garrison incident, and refers to the arguments in its Motion that there

17   is no evidence of negligence or unseaworthiness.  *Id.* at 9−10.

## III.    ANALYSIS

### A.    Legal Standard for Summary Judgment

20         Summary judgment on a claim or defense is appropriate "if the movant shows that there is

21   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

22   law."  Fed. R. Civ. P. 56(a).[7]  Once the movant has made this showing, the burden then shifts to

23   the party opposing summary judgment to designate "specific facts showing there is a genuine

24   issue for trial."  *Id.*  "[T]he inquiry involved in a ruling on a motion for summary judgment . . .

25   implicates the substantive evidentiary standard of proof that would apply at the trial on the

---

[6] Other than Captain Sweeney's explanation of it, neither party has presented any evidence of what the line handling manual actually says.

[7] The Federal Rules of Civil Procedure apply to admiralty proceedings unless inconsistent with the supplemental rules for admiralty proceedings.  Fed. R. Civ. P. Supp. A(2).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the

2    court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S.

3    372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based

4    on the record as a whole, there is no "genuine issue for trial" and summary judgment is

5    appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

6        Because the District is the party moving for summary judgment, the Court draws all

7    reasonable inferences in Cahill's favor for the purpose of this Order.

8      **B.**     **Objection to Captain Sweeney's Report as Unsworn**

9        The District objected to the use of Captain Sweeney's report on the basis that it is not a

10    sworn declaration or affidavit, and therefore could not properly be considered on a motion for

11    summary judgment. Reply at 2−3. The District is correct that unsworn expert reports "do not

12    qualify as affidavits or otherwise admissible evidence for purposes of Rule 56." *Smith v. City of*

13    *Oakland*, No. C-05-4045 EMC, 2007 WL 2288328, at *4 (N.D. Cal. Aug. 9, 2007) (citation

14    omitted). The same is true of Sweeney's CV, which purports to demonstrate her experience in the

15    industry but, like the report, is not itself a sworn declaration. *See* Marks Decl. Ex. 5. Cahill's

16    counsel Lia Marks submitted her own sworn declaration attaching both documents, but there is no

17    indication that Marks has personal knowledge of the contents of Sweeney's expert report or CV.

18    *See generally* Marks Decl.

19        The problem can be remedied. "'[S]ubsequent verification or reaffirmation of an unsworn

20    expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's

21    report on a motion for summary judgment.'" *Volterra Semiconductor Corp. v. Primarion, Inc.*,

22    796 F. Supp. 2d 1025, 1039 (N.D. Cal. 2011) (quoting *Maytag Corp. v. Electrolux Home Prods.,*

23    *Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006)). In the circumstances of this case, it would

24    not serve the purposes of Rule 56 to grant summary judgment on the basis of a procedural mistake

25    by Cahill's counsel without providing an opportunity to remedy the defect, when it was apparent

26    from the record that Cahill could likely do so. The Court therefore granted Cahill leave to file a

27    sworn declaration by Sweeney endorsing Sweeney's earlier report and CV, and Cahill has now

28    done so. Sweeney Decl. (dkt. 43). The District's objection is overruled.

United States District Court
Northern District of California

1    **C.     Unseaworthiness Claim**

2         **1.    Legal Standard for Unseaworthiness**

3         "A shipowner has an absolute duty to furnish a seaworthy ship.  A seaworthy ship is one

4    reasonably fit for its intended use.  The shipowner's actual or constructive knowledge of an

5    unseaworthy condition is not essential to its liability." *Ribitzki v. Canmar Reading & Bates, Ltd.*

6    *P'ship*, 111 F.3d 658, 664 (9th Cir. 1997) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539,

7    549–50 (1960)) (citations omitted).  Although a seaman is "not entitled to a perfect work space,"

8    the ship cannot be unreasonably defective.  *See id.* at 665; *see also Am. Seafoods Co. v. Nowak*,

9    2002 A.M.C. 1659, 2002 WL 31262107, at *3 (W.D. Wash. 2002) ("The standard is not absolute

10   perfection, but reasonable fitness for the intended service." (citing *Usner v. Luckenbach Overseas*

11   *Corp.*, 400 U.S. 494 (1971))).  In order to bring a claim based on unseaworthy equipment, a

12   plaintiff "must establish: (1) the warranty of seaworthiness extended to him and his duties; (2) his

13   injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the

14   equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition

15   proximately caused his injuries." *Id.* at 664.

16        "[T]he warranty of seaworthiness extends to the crew as well as the ship and . . . the owner

17   warrants that the crew, although not necessarily competent to meet all contingencies is equal in

18   disposition and seamanship to the ordinary men in the calling." *Peterson v. United States*, 224

19   F.2d 748, 750 (9th Cir. 1955) (citation and internal quotation marks omitted).

20        **2.    A Rational Jury Could Find That the *Golden Gate* Was Unseaworthy**

21        Cahill, who had worked on all of the District's ferries, testified at his deposition that the

22   open chock he fell through on the *Golden Gate* was wider than the chocks on any other ferry in the

23   District's fleet.  Cahill Dep. 17:17–20, 59:8–15.[8]  Cahill also testified that he does not believe he

24   would have fallen overboard if the chock had been narrower.  Cahill Dep. 60:15–21.  There is

25   nothing in the record to indicate any reason why the chock would need to be as wide as it is.

26   _____

27        [8] Cahill's Opposition does not meaningfully address his testimony regarding the width of the
     open chock.  The Court "has no independent duty 'to scour the record in search of a genuine issue

28   of triable fact,'" *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (citation omitted),
     but having found evidence establishing such an issue, the Court declines to turn a blind eye to it.

1    Taking that evidence into account, as well as common knowledge that the decks of ferries

2 can be unstable depending on maneuvers and sea conditions, a rational jury could conclude that

3 the open chock on the *Golden Gate* was not "reasonably fit for its intended use" because its width

4 created an unnecessary risk of crewmembers falling overboard. *See Ribitzki*, 111 F.3d at 664. The

5 apparent lack of other accidents related to the chock, and lack of seamen raising concerns about its

6 safety, may tend to support the District's view that the vessel was seaworthy, but it does not bar

7 Cahill's claim as a matter of law, and it is not the Court's role to weigh countervailing evidence on

8 a motion for summary judgment.

9    Turning to the remaining elements of an unseaworthiness claim, a jury could conclude that

10 the width of the chock proximately caused Cahill's injury, and there is no dispute that the warranty

11 of seaworthiness extended to Cahill or that the chock is "a piece of the ship's equipment." *See id.*

12    The District asserts that Cahill was negligent in stepping aft toward the open chock, and

13 argues that such negligence bars Cahill's unseaworthiness claim. Reply at 9−10. The cases the

14 District cites are inapposite. In *Burdett v. Matson*, the court granted summary judgment for an

15 employer where the unseaworthiness claim was based on a coworker having left a piece of

16 equipment in a precarious position from which it fell and injured the plaintiff. *Burdett*, 2015

17 A.M.C. 431, 2015 WL 419694, at *4−5 (D. Haw. Jan. 30, 2015). The court held that "a single,

18 isolated negligent act" of a coworker does not constitute "a condition of the ship," and thus cannot

19 support an unseaworthiness claim. *Id.* at *5. In *Keel v. Greenville Mid-Steam Services*, the Fifth

20 Circuit affirmed a district court's decision that a plaintiff could not base an unseaworthiness claim

21 on a condition that he himself created, where his negligence was "one hundred percent" to blame.

22 *Keel*, 321 F.2d 903, 903−04 (5th Cir. 1963). In contrast to both cases, the width of the open chock

23 on the *Golden Gate* was neither an isolated act of negligence by a coworker nor a condition that

24 Cahill himself created. Whether Cahill was negligent in stepping toward the chock, and the

25 percentage of fault attributable to any such negligence, are questions that require a factfinder to

26 weigh the evidence and cannot be resolve on the present motion. *See Burdett*, 2015 WL 419694,

27 at *5 ("Maritime law has long applied the rule of comparative fault in a seaman's unseaworthiness

28 action against a shipowner." (citing *Knight v. Alaska Trawl Fisheries, Inc* ., 154 F.3d 1042, 1047

United States District Court
Northern District of California

10

1  (9th Cir. 1998))).

2  The District's Motion is therefore DENIED as to Cahill's unseaworthiness claim.  Because

3  the issue of the width of the open chock is sufficient for this claim to survive summary judgment,

4  the Court need not address whether other conditions of the *Golden Gate* on the day of the accident

5  could also support an unseaworthiness claim.

6  **D.     Jones Act Negligence Claim**

7  **1.   Legal Standard for Jones Act Negligence**

8  "The elements of a Jones Act negligence claim are: duty, breach, notice and causation."

9  *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 662 (9th Cir. 1997).  The Jones

10  Act incorporates the standard of negligence applicable to railroad employers under the FELA, and

11  "the general congressional intent was to provide liberal recovery for injured workers."  *See*

12  *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958).

13  As stated in a widely-cited opinion by the Fifth Circuit, "nothing in the text or structure of

14  the FELA–Jones Act legislation suggests that the standard of care to be attributed to either an

15  employer or an employee is anything different than ordinary prudence under the circumstances."

16  *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338 (5th Cir. 1997) (en banc) (citing  *Fashauer*

17  *v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1283 (3d Cir. 1995)); *see also* 9th Cir.

18  Model Jury Instruction 7.3 ("Negligence under the Jones Act is the failure to use reasonable

19  care.").  An employer's duty includes "provid[ing] the seaman with a safe place to work."

20  *Ribitzki*, 111 F.3d at 662.

21  The causation standard, however, is lower than that applicable to an ordinary negligence

22  claim.  A plaintiff must show only that "employer negligence played any part, even the slightest,

23  in producing the injury or death for which damages are sought."  *Rogers v. Mo. Pac. R.R. Co.*, 352

24  U.S. 500, 506 (1957).  This is "often described as a featherweight causation standard."  *Ribitzki*,

25  111 F.3d at 664; *see also id.* at 662 n.3.  Nevertheless, "plaintiffs still must demonstrate some

26  causal connection between a defendant's negligence and their injuries."  *Claar v. Burlington N.*

27  *R.R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994).

28  The notice element applies where the alleged negligence is based on an unsafe

United States District Court
Northern District of California

11

workplace—such a claim requires that "the employer or its agents either *knew or should have known* of the dangerous condition." *Ribitzki*, 111 F.3d at 663. The Court is not aware of cases applying a notice requirement where a claim is based on negligent conduct rather than negligently unsafe conditions.

### 2. A Rational Jury Could Find That the District Was Negligent

Cahill argues that his negligence claim should be allowed to proceed because, among other reasons, the District's purported violation of a Coast Guard regulation requiring vessels to operate at safe speeds constitutes negligence *per se*. Opp'n at 4−5. In its Reply, the District raises a number of arguments why the Court should reject Cahill's *per se* theory, including that it was not pled in the Complaint, that Cahill's injury was not the type the regulation is intended to prevent, and that "general regulations like [the safe speed regulation] that require the 'exercise of one's practical judgment' do not give rise to negligence *per se*." Reply at 3−5 (quoting *Wilson v. Maersk Line, Ltd.*, No. 05 Civ. 6246 (LMM), 2007 WL 3085436, at *2 (S.D.N.Y. Oct. 18, 2007)).[9] The Court need not resolve the contours of a potential *per se* claim, because if there is evidence on which a jury could find that the *Golden Gate* approached the dock at an unsafe speed, the failure to operate at a safe speed could support a negligence claim even in the absence of a specific regulation.

There can be no dispute that the ferry captain[10] had a duty to operate the vessel in a reasonable manner. The question, then, is whether he breached that duty by approaching the Larkspur dock at an unsafe speed or angle—or more precisely, whether there is evidence in the record from which a rational jury could reach that conclusion. By far the most significant evidence in the District's favor is Cahill's own deposition testimony that he did not believe the captain was at fault. Cahill Dep. 51:9−12. Weighing against that is Captain Sweeney's conclusion that "[t]he vessel's fast approach coupled with the too great of an angle/distance away

---

[9] The Reply slightly misquotes *Wilson*, which uses the phrase "one's *best* practical judgment." *Wilson*, 2007 WL 3085436, at *2 (emphasis added). The omission is not material.

[10] Although not addressed in the parties' briefs, the doctrine of *respondeat superior* applies in Jones Act cases, and the District can therefore be held liable for negligence of the ferry captain. *See Beech v. Hercules Drilling Co.*, 691 F.3d 566, 571 (5th Cir. 2012).

1  from the dock made it hazardous for a deckhand to effectively make fast a mooring line," and her

2  characterization of the approach as "unsafe and non-standard."  Marks Decl. Ex. 3 at 1.  The

3  videos of both the accident and the normal docking procedure provide additional evidence of what

4  happened on the day of the accident and how it compares to the normal procedure.  *See* Russo

5  Decl. Exs. B, D.

6          The District objects that Sweeney's report does not identify sufficient "specific facts" to be

7  admissible as an expert opinion.  Reply at 5 (citing *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d

8  825, 831 (9th Cir. 2001)).  While the District is correct that Sweeney's report is sparse when it

9  comes to details, the case the District cites makes clear that the issue is not whether "the

10  underlying factual details [are] disclosed in the affidavit," but rather "the existence of underlying

11  facts [in the record] which could support the opinions," and whether the report identifies some

12  factual basis.  *Guidroz-Brault*, 254 F.3d at 831−32.  The record contains, and Sweeney's report

13  explicitly discusses, videos that both parties agree show how the docking evolution normally

14  works and how it happened on the day of the accident.  Russo Decl. Exs. B, D.  Sweeney has

15  extensive experience operating commercial vessels.  Marks Decl. Ex. 5.  The Court cannot say as a

16  matter of law that someone with Sweeney's background could not reach an informed opinion

17  regarding the safety of the approach to the Larkspur dock based on the videos.  That the opinion

18  does not give a numerical value for how fast the ferry was going or what would be a safe speed,

19  *see* Reply at 5, is an issue of weight rather than admissibility.

20          Based on the record as a whole—including but not limited to Captain Sweeney's expert

21  opinion, the two videos, and Cahill's testimony that the ferry bumped the dock significantly harder

22  than usual, *see* Cahill Dep. 35:15−21—a rational jury could find that the ferry captain, and

23  vicariously the District, breached his duty of care by approaching the Larkspur dock too quickly

24  and from a wider-than-usual angle.  A jury could also find that such negligence played at least "the

25  slightest" part in causing Cahill's injury, satisfying the "featherweight causation standard"

26  applicable to Jones Act claims.  *See Rogers*, 352 U.S. at 506; *Ribitzki*, 111 F.3d at 664.  The

27  District's Motion is therefore DENIED as to Cahill's Jones Act negligence claim.

28

### E.     Arguments Not Reached

The parties' briefs raise several arguments not addressed in detail in this Order.  Cahill's Opposition includes arguments for *per se* negligence or unseaworthiness that were not addressed in the District's Motion, apparently because the District was not aware that Cahill intended to pursue those theories.  In response, the District's Reply contends that Cahill cannot recover on those theories for a number of reasons, including that Cahill did not plead them in the Complaint, that the regulations Cahill invokes cannot support negligence *per se*, and that certain regulations are not applicable to the *Golden Gate* based on its size and capacity or based on the waters on which it travels.[11]  Although the Court does not assign blame exclusively to either party, the result of how the briefing unfolded is that a number of potentially significant issues were not raised until the Reply, and thus were never addressed by Cahill.  That posture is not conducive to the Court rendering an informed decision on the issues presented.  Because Cahill may proceed on both his unseaworthiness and negligence claims for the reasons stated above, the Court declines to reach the remaining arguments.

The briefing here suggests a failure of communication between the parties.  Should this case proceed to trial, this Order is without prejudice to the District raising any issues not reached herein through motions in limine.  The parties are strongly encouraged to meet and confer to determine whether any such issues can be resolved without motions practice and to ensure that any motions that are ultimately necessary will efficiently address both parties' arguments.  If Cahill determines that amendments to his Complaint are warranted in order to pursue *per se* theories of liability—an issue the Court expresses no opinion on in this Order—and the parties are not able to stipulate to such amendments, Cahill may move for leave to amend the Complaint no later than two weeks from the date of this Order, and the District may oppose that motion.

## IV.     CONCLUSION

For the reasons discussed above, the District's Motion for Summary Judgment is DENIED. If Cahill decides that he wishes to amend his Complaint to explicitly plead *per se* theories of

---

[11] The Court notes that neither party has presented any evidence regarding the *Golden Gate*'s size, capacity, or range of travel.

liability, he may move for leave to do so no later than two weeks from the date of this Order.

**IT IS SO ORDERED.**

Dated: March 18, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California